# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| **DAVID MILLENDER,** | ) | **NO. CV 19-2809-KS** |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| **R.C. JOHNSON, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

## INTRODUCTION

On April 11, 2019, Petitioner, a California state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254. (Dkt. No. 1.) The operative pleading is the First Amended Petition ("FAP"), which Petitioner filed on May 8, 2019. (Dkt. No. 5.) The parties have consented to the jurisdiction of the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 2 and 15.)

///

///

On October 22, 2019, Respondent filed an Answer to the FAP and lodged relevant state court records. (Dkt. Nos. 17 and 18.) On January 9, 2020, Petitioner filed a Traverse. (Dkt. No. 23.) On February 3, 2020, the Court ordered Respondent to lodge a copy of a videotape that was presented as evidence at trial or file a statement explaining that the videotape is no longer available. (Dkt. No. 24.) On March 18, 2020, Respondent filed a declaration stating that it appeared the videotape is no longer available. (Dkt. No. 27.) Briefing in this action is now complete, and the matter is under submission to the Court for decision.

## PRIOR PROCEEDINGS

On October 12, 2016, a Los Angeles County Superior Court jury convicted Petitioner of first-degree murder (California Penal Code ("Penal Code") § 187(a)). (Clerk's Transcript ("CT") 174; 5 Reporter's Transcript ("RT") 1802.) The jury also found true allegations that Petitioner personally used a firearm (Penal Code § 12022.53(b)), personally and intentionally discharged a firearm (Penal Code § 12022.53(c)), and personally and intentionally discharged a firearm which caused great bodily injury and death (Penal Code § 12022.53(d)). (CT 174; 5 RT 1802-03.) On October 26, 2016, Petitioner admitted that he had a prior strike conviction (Penal Code §§ 667(a)(1), (b)-(i); 1170.12(a)-(d)). (CT 200; 5 RT 2104.) The trial court sentenced him to 75 years to life plus five years in state prison. (CT 199; 5 RT 2115-16.)

Petitioner appealed the judgment of conviction. (Lodgments ("Lodgs.") A-D.) On July 16, 2018, the California Court of Appeal issued a reasoned, unpublished opinion in which it remanded the case to allow the trial court an opportunity to exercise its discretion as to whether to strike the firearm enhancements (given a recent amendment to the applicable statute) and struck a domestic violence fee. (Lodg. E at 52-54.) Petitioner states that his current sentence is 75 years to life (FAP at 2), indicating that the trial court declined to strike the firearm enhancements. The California Court of Appeal otherwise affirmed the judgment of conviction in its reasoned decision. (Lodg. E at 9-52.) Petitioner then filed a Petition for Review in the

California Supreme Court.  (Lodg. F.)  On October 24, 2018, the California Supreme Court summarily denied the Petition without comment or citation of authority.  (Lodg. G.)

## SUMMARY OF THE EVIDENCE AT TRIAL

The following factual summary from the California Court of Appeal's unpublished decision on direct review is provided as background.  *See also* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct" unless rebutted by the petitioner by clear and convincing evidence).

Brothers [Petitioner], Theodore and Willie Millender,[2] along with [Petitioner's] girlfriend Rochandra Roberson, lived together in a house located on 120th Street in Los Angeles.  Willie, who was in his 60's, was the oldest; [Petitioner], at 49 years old, was the youngest.  Willie was nicknamed "Spike" or "Spikey."  He was a long-term user of crack cocaine, and was unemployed. Theodore also smoked cocaine.

> [2]  For ease of reference, and with no disrespect, we hereinafter refer
> to the Millender brothers by their first names.

Each brother had his own bedroom.  Willie's and Theodore's bedrooms were adjacent to the kitchen; the bedroom [Petitioner] shared with Roberson was at the other end of the house.  To reach Willie's and Theodore's bedrooms from [Petitioner's] bedroom, it was necessary to cross through the kitchen.  The property included a second house located behind the main house.  The main house was equipped with a video surveillance system that filmed the kitchen, a patio area, and the driveway, but not the bedrooms.

Each of the four residents was responsible for a share of the household expenses. [Petitioner] collected the money and he and Roberson paid the bills. Willie's monthly share was $200. Frequently, Willie spent his entire monthly government check on cocaine and was late or unable to pay. When this happened, one of the others would cover Willie's share. Willie's failure to pay made "everybody," including [Petitioner], "mad."

[Petitioner] insisted Willie and Theodore not smoke cocaine in the main house, because he was concerned that Roberson — who worked for the postal service and was subject to drug testing — might be affected by the fumes. Instead, the men were to smoke in the back house. This created tension because Willie felt he should be able to smoke wherever he wanted to. Additionally, Willie frequently asked other persons, including [Petitioner's] friends, for handouts of change and cigarettes, which sometimes displeased [Petitioner].

In early May 2016, Willie failed to pay his share of the expenses. [Petitioner] told Roberson, "I'm going to get at Spike about him not wanting to pay."

Video footage from the kitchen surveillance camera showed that at approximately 9:45 p.m. on May 3, 2016, [Petitioner] walked through the kitchen to the area of Willie's room. Approximately a minute and a half later, Roberson hurried through the kitchen to Willie's room because she heard "scuffling" between [Petitioner] and Willie. Moments later, Roberson backed into the kitchen, obviously distraught, as [Petitioner] dragged Willie into the kitchen. While Willie was on his knees, [Petitioner] slammed Willie's face down onto the seat of a chair, and then threw him across the room, causing Willie to fall to the ground on his back. As Roberson pleaded with [Petitioner] to stop, [Petitioner]

4

punched Willie, who was still prone on the floor, twice with his fist. [Petitioner] then left the kitchen, followed by Roberson. According to Roberson, the argument was about Willie's failure to pay his share of the expenses. [Petitioner] also asked Willie to go to the back house to smoke.

Willie got up from the floor and went back to his room. Roberson, either immediately or at some point shortly thereafter, left the house. Theodore then entered the kitchen. Within a minute after the punching incident, [Petitioner] strode back through the kitchen toward Willie's room, with a gun in his right hand. Approximately 15 seconds later, [Petitioner] reentered the kitchen with the gun still in his hand. During the next several minutes, [Petitioner] repeatedly traversed the kitchen, going back and forth between the areas of his and Willie's rooms. Theodore, who had heard what sounded to him like a "firecracker shot," found Willie lying on his (Willie's) bedroom floor. Theodore went to a neighbor's house, and paramedics were called. Within 10 minutes, [Petitioner] left the house, carrying some clothing.

When sheriff's deputies arrived they found Willie, deceased, lying on his side in his bedroom in a pool of blood. Theodore, who appeared distraught and frightened, told a deputy, "'My little brother killed him.'" Later that night, Theodore told another deputy that he had been awakened by his brothers arguing about the bills, and saw [Petitioner] holding a black gun in his right hand.[3]

[3] At trial, Theodore denied hearing or seeing an argument or seeing [Petitioner] with a gun. He claimed he had been awakened by the gunshot.

5

Deputies discovered a loaded nine-millimeter magazine and a "speedy loader" in [Petitioner's] bedroom. A single nine-millimeter shell was found in Willie's room. Two nine-millimeter handguns and ammunition were located in a hallway closet.

An autopsy confirmed that Willie died from a gunshot wound to the forehead. The absence of stippling or soot indicated the shot was likely fired from a distance of over three feet away. The entry wound went upwards at an approximate 70 degree angle. Within the body, the bullet moved front to back and upwards. A toxicology report showed the presence of cocaine in Willie's system, but this had no bearing on the cause of death. There were three lacerations on Willie's forehead which, according to a coroner's investigator's report, were likely caused by Willie's head hitting a nightstand in the bedroom. It could not be determined whether Willie was lying down or standing up when he was shot.

[Petitioner] surrendered to police and was arrested on May 21, 2016.

a. *Defense evidence*

(i) *[Petitioner's] testimony*

[Petitioner] testified on his own behalf, as follows. Between May 1, 2016, and the day of the shooting, as "punishment" for Willie's squandering his entire check on cocaine and his resultant failure to pay his share of the bills, when Willie's friends arrived to visit and smoke cocaine, [Petitioner] sent them away. This made Willie angry and he said to [Petitioner], "'You think you the boss.'"

When [Petitioner] initially went to Willie's room on the night of May 3, 2016, he intended to ask Willie what he meant by that comment. In Willie's bedroom, the men argued. [Petitioner] pointed out that Willie had failed to pay his share of the bills, told him his friends could no longer come over, and insisted that Willie not smoke in the house, due to [Petitioner's] concern about Roberson's drug testing requirement. Willie refused to go to the back house to smoke. Willie "got mad at [[Petitioner]] for what [[Petitioner]] said" and "tried to fight" [Petitioner]. Willie punched [Petitioner]. [Petitioner] tried to "detain" Willie, and they wrestled. [Petitioner] then dragged Willie into the kitchen. Although in the video it appeared that [Petitioner] was punching Willie while he was on the ground, the film did not accurately depict the incident. Willie was "fighting, too" and "wouldn't stop." [Petitioner] punched Willie to get him to stop "acting the way he was acting," but did not hit his face or head. [Petitioner] was "hot at the time. I was just mad. I don't know what I was doing. I was just mad."

[Petitioner] briefly returned to his bedroom. Approximately a week before the shooting, [Petitioner] had purchased a gun. [Petitioner] had the gun with him the entire day on May 3; he did not return to his bedroom to retrieve it. [Petitioner] then returned to Willie's bedroom, intending to display the gun in an effort to scare Willie into going to the back house. [Petitioner] was not upset about the failure to pay the bills, which was a common occurrence; he was concerned about the smoking issue. When [Petitioner] entered Willie's room, Willie grabbed [Petitioner] and they tussled over the gun. They pushed each other, and [Petitioner] fell backwards. As [Petitioner] fell, the gun discharged accidentally. [Petitioner] did not aim the gun at Willie and did not intend to shoot or kill Willie; he just wanted to scare him. [Petitioner] was shocked and did not know what to do. He saw deputies as he was leaving the house, and discarded the gun in a trash

can. He did not speak to police right away because he believed he needed a lawyer first.

[Petitioner] did not think he had chambered a round before entering Willie's room. He had not checked to see if the gun was loaded. He knew how to load a gun and slide the hammer back, but he was not really familiar with firearms operations and was not an expert. He admitted that one of the guns found in the closet was his, and that he had suffered a conviction "involving a firearm" in 2004.

When [Petitioner] told Roberson he was "going to get at" Willie about the bills, he had not meant he intended to hurt him; he meant he would talk to Willie. He and Willie had been "real close." Before that night, he and Willie had "never had a fight a day in [their] li[ves]." There were never problems between the two of them. Willie's failure to pay the bills was "no big deal."

[Petitioner] admitted he occasionally sold cocaine, traded cocaine for cigarettes, and sold cocaine to Willie. He did not possess the gun to protect himself during drug sales.

[Petitioner] was at least 25 pounds heavier than Willie.

(ii) *Other defense evidence*

Three family friends, who knew both [Petitioner] and Willie well, testified they had never heard [Petitioner] say he wanted to hurt Willie.

///
///
///

8

b. *Prosecution rebuttal evidence*

Semiautomatic pistols typically have a safety mechanism that must be depressed in order to allow the gun to fire. A single action trigger requires four to seven pounds of pressure and a double action trigger requires eight to 13 pounds of pressure. Guns can be accidentally fired. Adequate training and familiarity with firearms are important factors to prevent unintentional firearm discharge.

(Lodg. E at 2-8.)

## PETITIONER'S HABEAS CLAIMS

Petitioner presents the following grounds for habeas relief.

*Ground One*: Petitioner's right to confrontation was violated by the admission of the statements of the coroner who performed the autopsy but did not testify at trial. (Dkt. No. 5 at 5; Dkt. No. 5-1 at 10, 12-14; *see also* Dkt. No. 23 at 5.)[1]

*Ground Two*: The prosecutor committed misconduct during cross-examination and closing argument. Specifically, the prosecutor committed misconduct by: impeaching Petitioner with evidence of his drug sales; misstating the law regarding murder; erroneously telling the jury they had to consider the charges in a particular order; mischaracterizing the evidence of Petitioner's drug sales and use of a firearm; attacking defense counsel's integrity; accusing Petitioner of lying or committing perjury; arguing matters outside the record and

---

[1] Because the parties' pleadings and lodgments do not all have consecutive page numbering, the page numbers from those documents referenced in this decision are those automatically generated by the Court's electronic filing system.

appealing to the jury's sympathy; and referencing the Bible.  (Dkt. No 5 at 5; Dkt. No. 5-1 at 10, 28-30; Dkt. No. 5-2 at 1-3; *see also* Dkt. No. 23 at 5-7.)

*Ground Three*:   The trial court erred by failing to instruct the jury on voluntary manslaughter.  (Dkt. No. 5 at 6; Dkt. No. 5-2  at 16-21; *see also* Dkt. No. 23 at 7-8.)

*Ground Four*:  Defense counsel rendered ineffective assistance of counsel.  Specifically, defense counsel was ineffective because he: failed to object to the admission of the coroner's report as a violation of the Confrontation Clause; failed to object to the prosecutor's cross-examination of Petitioner with evidence of drug sales activity; and failed to object to multiple instances of prosecutorial misconduct during closing arguments.  (Dkt. No. 5 at 6; Dkt. No. 5-1 at 10, 14-18; Dkt. No. 5-2 at 3-5; *see also* Dkt. No. 23 at 11-13.)

## STANDARD OF REVIEW

**I.**    **The Antiterrorism And Effective Death Penalty Act**

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a state prisoner whose claim has been "adjudicated on the merits" cannot obtain federal habeas relief unless that adjudication:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For the purposes of Section 2254(d), "clearly established Federal law" refers to the Supreme Court holdings in existence at the time of the state court decision in issue.  *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011); *see also Kernan v. Cuero*, __ U.S. __, 138 S. Ct. 4, 9

(2017) (*per curiam*) ("circuit precedent does not constitute clearly established federal law. . . . [n]or, of course, do state-court decisions, treatises, or law review articles") (internal quotation marks and citations omitted). A Supreme Court precedent is not clearly established law under § 2254(d)(1) unless it "squarely addresses the issue" in the case before the state court or establishes a legal principle that "clearly extends" to the case before the state court. *Moses v. Payne*, 555 F.3d 742, 760 (9th Cir. 2009); *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011) (it "'is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by'" the Supreme Court) (citation omitted).

A state court decision is "contrary to" clearly established federal law under Section 2254(d)(1) only if there is "a direct and irreconcilable conflict," which occurs when the state court either (1) arrived at a conclusion opposite to the one reached by the Supreme Court on a question of law or (2) confronted a set of facts materially indistinguishable from a relevant Supreme Court decision but reached an opposite result. *Murray v. Schriro*, 745 F.3d 984, 997 (9th Cir. 2014) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application" of clearly established federal law under Section 2254(d)(1) if the state court's application of Supreme Court precedent was "objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014). The petitioner must establish that "there [can] be no 'fairminded disagreement'" that the clearly established rule at issue applies to the facts of the case. *See id.* at 1706-07 (internal citation omitted). Finally, a state court's decision is based on an unreasonable determination of the facts within the meaning of 28 U.S.C. § 2254(d)(2) when the federal court is "convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record before the state court." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir.) (internal quotation marks omitted), *cert. denied*, 135 S. Ct. 710 (2014). So long as "'[r]easonable minds reviewing the record might disagree,'" the state court's determination of

the facts is not unreasonable.  *See Brumfield v. Cain*, ___ U.S. ___, 135 S. Ct. 2269, 2277 (2015).

AEDPA thus "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, __ U.S. __, 136 S. Ct. 456, 460 (2015) (*per curiam*) (internal quotation marks and citation omitted).  Petitioner carries the burden of proof.  *See Pinholster*, 563 U.S. at 181.

## II.  The State Court Decision On Petitioner's Claims Is Entitled To AEDPA Deference.

Petitioner raised his claims on direct review in the California Court of Appeal.  (Lodg. A.)  The California Court of Appeal denied the claims in a reasoned decision on the merits. (Lodg. E.)  Petitioner then presented the claims to the California Supreme Court in the Petition for Review (Lodg. F), which the California Supreme Court denied summarily without comment or citation to authority (Lodg. G).  Thus, Section 2254(d) applies, and the Court looks through the California Supreme Court's summary denial to the last reasoned decision – the decision of the California Court of Appeal on direct review – to determine whether the state court's adjudication of Petitioner's claims is unreasonable or contrary to clearly established federal law.  *See Johnson v. Williams*, 568 U.S. 289, 297 n.1 (2013) ("Consistent with our decision in *Ylst v. Nunnemaker*, 501 U.S. 797, 806 (1991), the Ninth Circuit 'look[ed] through' the California Supreme Court's summary denial of [the petitioner's] petition for review and examined the California Court of Appeal's opinion."); *see also*, *e.g.*, *Jones v. Harrington*, 829 F.3d 1128, 1136 (9th Cir. 2016) (looking through California Supreme Court's summary denial of a petition for review to the California Court of Appeal's decision on direct review).

///

///

///

**DISCUSSION**

As an initial matter, Respondent contends that Ground One and most of the sub-claims for Ground Two are procedurally defaulted. (Dkt. No. 17 at 21-23, 31.) However, because it would be more efficient to resolve these claims on the merits, the Court elects to resolve them on that basis. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *Franklin v. Johnson*, 290 F.3d 1223, 1233 (9th Cir. 2002).

**I.    Habeas Relief Is Not Warranted For Petitioner's Confrontation Clause Claim.**

In Ground One, Petitioner claims that his right to confrontation was violated by the admission of the statements of the coroner who performed the autopsy but did not testify at trial. (Dkt. No. 5 at 5; Dkt. No. 5-1 at 10, 12-14; *see also* Dkt. No. 23 at 5.)

**A.    Legal Standard.**

The Sixth Amendment's Confrontation Clause provides:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). Only "testimonial" hearsay statements implicate the Confrontation Clause.  *See Michigan v. Bryant*, 562 U.S. 344, 354 (2011); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007); *Davis v. Washington*, 547 U.S. 813, 823-24 (2006).  A hearsay statement is testimonial when it is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  *Crawford*, 541 U.S. at 52.  The Confrontation Clause has no application to nontestimonial statements.  *See Whorton*, 549 U.S. at 420 (recognizing "*Crawford*'s elimination of Confrontation Clause protection against the

admission of unreliable out-of-court nontestimonial statements"). A statement is nontestimonial if it is "made out-of-court with a primary purpose other than prosecutorial use." *See United States v. Solorio*, 669 F.3d 943, 953 (9th Cir. 2012).

### B.     Analysis.

Dr. Levicky, a coroner, conducted the autopsy of the victim. (3 RT 602.) One of Dr. Levicky's findings was that the entry wound went upwards at an approximate 70 degree angle. (*Id.*) The defense intended to argue that this evidence demonstrated the shooting was accidental. (3 RT 603.) However, Dr. Levicky had retired with plans to leave the country by the time of Petitioner's trial. (3 RT 604.) Thus, a different coroner, Dr. Kennedy, testified at Petitioner's trial about Dr. Levicky's findings. (3 RT 607, 612.) Dr. Kennedy testified that Dr. Levicky found that the entry wound went upwards at approximately 70 degrees to the horizontal plane. (3 RT 628.)

Petitioner claims that the admission of Dr. Kennedy's testimony and a coroner's diagram completed by Dr. Levicky, in lieu of Dr. Levicky's live testimony, violated his Sixth Amendment right to confrontation. The California Court of Appeal rejected this claim, finding that the challenged evidence was not testimonial and that, even assuming arguendo it was admitted in error, it was harmless beyond a reasonable doubt. (Lodg. E at 17-20.)

On federal habeas review, a federal court must "[a]s a threshold matter . . . first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)). Here, it is not clearly established by Supreme Court precedent that reports completed during an autopsy are testimonial statements within the meaning of the Confrontation Clause. *See Hacheney v. Obenland*, 732 F. App'x 541, 543 (9th Cir. 2018) ("[W]hen [petitioner's] conviction became final, it was not clearly established . . . that reports performed in connection

14

with autopsies were testimonial"); *Hensley v. Roden*, 755 F.3d 724, 732 (1st Cir. 2014) ("The [Supreme] Court in no way — explicitly or implicitly — indicated that autopsy reports are testimonial in nature."). Nor is it clearly established that the Confrontation Clause is violated by the admission of out-of-court expert statements that are relied on by another expert who does testify at trial. *See Hill v. Virga*, 588 F. App'x 723, 724 (9th Cir. 2014) ("The Supreme Court has not clearly established that the admission of out-of-court statements relied on by an expert violates the Confrontation Clause."); *Grim v. Fisher*, 816 F.3d 296, 309 (5th Cir. 2016) ("[T]he Supreme Court has not clearly established what degree of involvement with the forensic testing is required of an in-court witness offered to prove a particular fact in a testimonial certification. . . ."). In the absence of clearly established federal law, the California Court of Appeal's rejection of this claim could not have been objectively unreasonable. *See Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law.") (citing *Dows v. Wood*, 211 F.3d 480, 485-86 (9th Cir. 2000)).

Even if it were clearly established that Petitioner's claim implicated testimonial hearsay under the Confrontation Clause, habeas relief still would be unwarranted. The erroneous admission of evidence in violation of the Confrontation Clause is subject to harmless error analysis. *See, e.g., Bullcoming v. New Mexico*, 564 U.S. 647, 668 n.11 (2011); *Delaware v. Van Arsdall*, 475 U.S. 673, 681-84 (1986). Petitioner argues that the alleged Confrontation Clause error arising from the admission of Dr. Levicky's reports through the trial testimony of a substitute coroner — in lieu of Dr. Levicky's trial testimony — was not harmless because Dr. Levicky's trial testimony would have been strong evidence for the defense theory that the shooting was accidental. (Dkt. No. 5-1 at 13-14; *see also* Lodg. F at 20-21.) However, this does not appear to be an argument in substance arising from the Confrontation Clause, but rather appears to be an argument invoking a right to present Dr. Levicky's trial testimony to support a defense theory of an accidental shooting. *See Richmond v. Embry*, 122 F.3d 866,

15

871 (10th Cir. 1997) (distinguishing Confrontation Clause claims from claims based on the rights to present a defense and to compulsory process).

Under the Confrontation Clause claim that Petitioner raised here, the allegedly erroneous admission of the autopsy report was harmless.  Dr. Levicky's autopsy report was not damaging to Petitioner's defense and was not important to the prosecutor's case.  For the defense, the report was beneficial because Dr. Levicky's findings, particularly the finding about the 70 degree entry angle of the bullet, could not be challenged by the prosecutor and allowed Petitioner to argue that the shooting was accidental.  (4 RT 1283-85.)  For the prosecutor, Dr. Levicky's report was not important to his case but merely established the cause of the victim's death as a gunshot wound to the head (3 RT 629-30), which was undisputed.  Thus, even assuming that the admission of Dr. Levicky's autopsy report was error in violation of the Confrontation Clause, the error was harmless.  *See Van Arsdall*, 475 U.S. at 684 (identifying the importance of the witness's testimony to the prosecution's case as a factor the court considers in determining whether the Confrontation Clause error was harmless); *see also United States v. Bostick*, 791 F.3d 127, 150 (D.C. Cir. 2015) (assuming arguendo that admission of autopsy reports violated Confrontation Clause but holding that the error was harmless where the autopsy reports did not play an important role in the trial).  Accordingly, habeas relief is not warranted for this claim.

## II.  Habeas Relief Is Not Warranted For Petitioner's Prosecutorial Misconduct Claims.

In Ground Two, Petitioner claims that the prosecutor committed misconduct in multiple instances.  Specifically, the prosecutor committed misconduct by: impeaching Petitioner on cross-examination with evidence of his drug sales; misstating the law regarding murder; erroneously telling the jury they had to consider the charges in a particular order; mischaracterizing the evidence of Petitioner's drug sales and use of a firearm; attacking

16

defense counsel's integrity; accusing Petitioner of lying or committing perjury; arguing matters outside the record and appealing to the jury's sympathy; and referencing the Bible. (Dkt. No 5 at 5; Dkt. No. 5-1 at 10, 28-30; Dkt. No. 5-2 at 1-3; *see also* Dkt. No. 23 at 5-7.)

## A. Legal Standard.

A prosecutor's actions constitute misconduct if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012). The *Darden* standard is a "highly generalized" assessment of the fairness of the trial, not an "elaborate, multistep test" or dependent on any particular consideration. *See Deck v. Jenkins*, 814 F.3d 954, 978 (9th Cir. 2014); *see also Parker v. Matthews*, 567 U.S. 37, 48 (2012). Accordingly, to determine whether a prosecutor's actions rise to the level of a due process violation, the reviewing court must examine the entire proceedings. *Boyde v. California*, 494 U.S. 370, 384-85 (1990); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Relevant factors may include the type and extent of the misconduct, any rebuttal by defense counsel, the specificity and timing of any curative instructions, and the weight of the evidence. *See Deck*, 814 F.3d at 979; *Hein v. Sullivan*, 601 F.3d 897, 914 (9th Cir. 2010). Additionally, to obtain habeas relief, the petitioner must demonstrate that the due process violation was not harmless. *See Wood*, 693 F.3d at 1113 (applying the harmlessness standard articulated in *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

///
///
///
///
///

**B.    Analysis.**

**1.    Alleged Misconduct During Cross-Examination.**

Petitioner contends that the prosecutor committed misconduct by cross-examining Petitioner about a drug arrest. (Dkt. No. 5-1 at 29-30; Dkt. No. 5-2 at 1.) The trial court ruled that if Petitioner testified, he could be impeached with evidence that he sold cocaine. (2 RT 15.) During direct examination, Petitioner testified that he sold drugs from his house "a couple of times" (4 RT 983), that he sometimes traded drugs for cigarettes (4 RT 992), and that he sometimes sold drugs to the victim (4 RT 983, 1027). The prosecutor then cross-examined Petitioner as follows:

> [Prosecutor:] I want to start out by asking you a couple of questions about you stated that you sold drugs from time to time, right?
>
> [Petitioner:] It wasn't no time after time.
>
> [Prosecutor:] Well, isn't it true, though, that you actually were arrested on July 15, 2015, for selling cocaine?
>
> [Petitioner:] July what?
>
> [Prosecutor:] July 15, 2015?
>
> [Petitioner:] I wasn't arrested on July 15th.
>
> [Prosecutor:] Oh, but I mean that's when you — so you were arrested later, but you were actually dealing cocaine on July 15, 2015; is that right?
>
> [Petitioner:] That's what they said.
>
> [Prosecutor:] Well, you were arrested for it, right?
>
> [Petitioner:] I wasn't arrested.
>
> [Prosecutor:] Is there a case pending against you?
>
> [Petitioner:] I was on the street July 15.
>
> [Prosecutor:] Is there a case pending against you for that charge?

[Petitioner:] Yes. Yeah.

(4 RT 1008-09.)

Defense counsel asked for a sidebar and advised the court that [Petitioner] had not been arrested. (4 RT 1009.) The trial court opined that an arrest was irrelevant for purposes of impeachment and indicated it would have sustained an objection had one been made. (4 RT 1010-11.) However, the trial court also opined that because Petitioner denied the cocaine sale referenced by the prosecutor, the prosecutor had latitude to question Petitioner about it. (4 RT 1011.) The trial court also observed that the prosecutor's questions were inartful, admonished the prosecutor to "get your questions right," and told defense counsel, "If you have objections, make them." (4 RT 1012-13.) When cross-examination resumed, Petitioner again denied selling cocaine on two specific dates in 2015 and 2016, but he admitted selling cocaine occasionally in 2014 and 2015. (4 RT 1013-14.)

Petitioner argues that the prosecutor's reference to an arrest was misconduct because it was factually inaccurate and because a witness may not be impeached with evidence of an arrest. (Dkt. No. 5-1 at 29-30; Dkt. No. 5-2 at 1.) The California Court of Appeal rejected this claim:

There is no dispute it was proper to impeach [Petitioner] with the fact he sold cocaine. (See *People v. Gabriel* (2012) 206 Cal.App.4th 450, 459 [crimes related to drug trafficking involve moral turpitude]; *People v. Clark* (2011) 52 Cal.4th 856, 931 [a witness may be impeached with any prior conduct involving moral turpitude, whether or not it resulted in a felony conviction].) The prosecutor's brief questions regarding [Petitioner's] arrest and pending case were insignificant in light of [Petitioner's] admissions, during direct examination, that he did in fact sell drugs on occasion, including to Willie. Given these admissions, any

19

implication [Petitioner] had been arrested was not likely to impact the jury's verdict. The prosecutor's questions, while clumsy, were not deceptive or reprehensible, and were not sufficiently egregious to infect the trial with unfairness or deny [Petitioner] due process.

(Lodg. E at 33-34.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. As the California Court of Appeal reasoned, evidence of Petitioner's past cocaine sales was admissible as impeachment evidence because it involved acts of moral turpitude. Thus, the prosecutor's questions about a drug arrest suggested at worst a negative inference about Petitioner that other evidence about his drug dealing had already permitted. *See United States v. Lester*, 749 F.2d 1288, 1302 (9th Cir. 1984) (rejecting prosecutorial misconduct claim, even where the prosecutor's reference to the defendant's drug dealing was improper, because "the entire trial was replete with references to drug dealing and violence, [rendering it] unlikely that such a comment would have had a material effect on the jury's verdict."); *see also United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994) (rejecting prosecutorial misconduct claim premised on a prosecutor's improper questions and comments that "did not permit the jury to make any negative inferences beyond those which other evidence already abundantly invited"). Given this context of the drug evidence presented at trial, it was not objectively unreasonable for the California Court of Appeal to conclude that the prosecutor's questions about a drug arrest did not likely impact the verdict. Accordingly, habeas relief is not warranted for this claim.

### 2. Alleged Misconduct During Closing Argument.

Petitioner further contends that the prosecutor committed misconduct in seven instances during closing argument. (Dkt. No. 5-2 at 1-3.)

### a. Misstating the Law Regarding Murder.

During his closing argument, the prosecutor stated the following about murder:

> Now, express malice is the first-degree murder.  Implied malice is second degree.  You have to find him not guilty, okay.  It's not like, well, you know, we can't decide whether it's first degree.  So you have to decide.  You have to acquit him of first degree murder before you even get to second degree murder.

> Okay.  I want you to know that.

> *What that means is you all have to agree that, you know what, there was no malice aforethought, that you believe his story that it was an accident which we know is ridiculous.*

(4 RT 1261-62) (emphasis added).

Petitioner contends that the prosecutor committed misconduct during this portion of the argument because it misstated the law regarding murder.  (Dkt. No. 5-2 at 2; *see also* Lodg. A at 66-67.)  The prosecutor's arguments allegedly "set the bar too high" for the jury to acquit Petitioner of first-degree murder:  according to the correct standard, Petitioner could be acquitted of first-degree murder so long as the jury found the absence of premeditation and deliberation (even if he had harbored malice aforethought); and the jury could have found him guilty of the lesser crime of second-degree murder even if it disbelieved the accident theory. (Lodg. A at 67.)  The California Court of Appeal rejected these arguments:

> Murder is an unlawful killing committed with malice aforethought.  (§ 187, subd. (a); *People v. Elmore* (2014) 59 Cal.4th 121, 132.)  A defendant acts with

express malice if he intends to kill.  (§ 188; *People v. Beltran*, *supra*, 56 Cal.4th at p. 941; *People v. Elmore*, at p. 132.)  Malice is implied when a killing results from an intentional act, the natural and probable consequences of which are dangerous to human life, deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.  (*People v. Elmore*, at p. 133; *People v. Gonzalez* (2012) 54 Cal.4th 643, 653.)  Murder is of the first degree when it is willful, deliberate and premeditated.  (§ 189; *People v. Elmore*, at p. 133; *People v. Beltran*, *supra*, at p. 942.)  Second degree murder is an unlawful killing with malice aforethought, but without the elements of willfulness, deliberation, and premeditation.  (*People v. Elmore*, at p. 133.)

It is improper for a prosecutor to misstate the law during argument.  (*People v. Whalen*, *supra*, 56 Cal.4th at p. 77; *People v. Mendoza* (2007) 42 Cal.4th 686, 702.)

The cited portion of the prosecutor's remarks was not a model of clarity. . . .  Both defense counsel and the prosecutor correctly stated the elements of premeditation and deliberation during their arguments, and the prosecutor referred jurors to the relevant instructions.  The trial court instructed the jury on homicide, first degree murder, and second degree murder.  (CALCRIM Nos. 500, 520, 521.)  It also instructed that the jury must "follow the law as I explain it to you" and "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  We presume the jurors understood and followed the court's instructions.  (*People v. Cortez* (2016) 63 Cal.4th 101, 131; *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1083 [if prosecutor misstated the law, error was harmless in light of trial court's correct instructions and the absence of evidence of jury confusion]; *People v. Williams* (2009) 170 Cal.App.4th 587, 635.)  There is no probability the jury here would

have ignored the instructions and the additional portions of both attorneys' arguments, and convicted [Petitioner] of first degree murder even if it found he did not premeditate and deliberate.

(Lodg. E at 37-38.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. To the extent that the highlighted passage of the prosecutor's statement of the law regarding murder was not entirely clear, it is reasonable to presume that any resulting confusion was clarified by the arguments on the whole and the trial court's instructions. Both the prosecutor and defense counsel correctly stated the elements of premeditation and deliberation during their arguments (4 RT 1258-61, 1275-76), and the prosecutor referred the jurors to the relevant instructions, including the instruction for first-degree murder (4 RT 1258). Most significantly, the trial court gave instructions on the relevant law regarding homicide, first-degree murder, and second degree murder. (CT 158-61; 4 RT 1241-45.) The trial court also instructed the jury that its explanation of the law must be followed and that if the attorneys' comments on the law conflicted with the instructions, the instructions must be followed. (CT 135; 4 RT 1227-28.)

Given this context, it is not reasonably likely that the prosecutor's ambiguous remark about murder infected the trial with unfairness. *See Boyde*, 494 U.S. at 384-85 (as a general matter, misstatements by counsel "are not to be judged as having the same force as an instruction from the court"); *United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008) ("The jury is regularly presumed to accept the law as stated by the court, not as stated by counsel.") (citation omitted). Moreover, it is presumed that the jury followed the trial court's instructions regarding the law. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); *see also Fischer v. Brown*, 578 F. App'x 631, 633 (9th Cir. 2014) (presuming that the jury followed the trial court's instructions on the

law despite the prosecutor's misstatement of the reasonable doubt standard); *Leinweber v. Tilton*, 490 F. App'x 54, 55 (9th Cir. 2012) (same despite the prosecutor's misstatement of the law regarding involuntary manslaughter); *Kopy v. Ryan*, 319 F. App'x 666, 668-69 (9th Cir. 2009) (same despite the prosecutor's multiple misstatements of the law). Accordingly, habeas relief is not warranted for this claim.

### b. Arguing the Charges Must be Considered in a Particular Order.

Petitioner cites the same passage from the prosecutor's argument about murder, as discussed above, to raise an additional claim of constitutional error:

> Now, express malice is the first-degree murder. Implied malice is second degree. You have to find him not guilty, okay. It's not like, well, you know, we can't decide whether it's first degree. So you have to decide. *You have to acquit him of first degree murder before you even get to second degree murder.*

> Okay. I want you to know that.

> What that means is you all have to agree that, you know what, there was no malice aforethought, that you believe his story that it was an accident which we know is ridiculous.

(4 RT 1261-62) (emphasis added).

Petitioner contends that the prosecutor erroneously instructed the jury that they had to consider the charges in a particular sequence, *i.e.*, that it could not consider second-degree

24

murder until it determined Petitioner was not guilty of first-degree murder.  (Dkt. No. 5-2 at 2; *see also* Lodg. A at 68.)  The California Court of Appeal rejected this claim:

> Under the "acquittal-first" rule, a court may instruct a jury that it cannot *return a verdict* on a lesser included offense until after it has acquitted of the greater offense, but may not prohibit the jury from *considering or discussing* the lesser offenses during deliberations before returning a verdict on the greater offense.  (*People v. Kurtzman* (1988) 46 Cal.3d 322, 324–325, 329; *People v. Brooks* (2017) 3 Cal.5th 1, 81.)
>
> The prosecutor's argument was, at worst, ambiguous.  The statements "[y]ou have to *find him not guilty*," "you have to *decide*," and "you have to *acquit him of first degree murder*" (italics added) permissibly suggested the jury had to return a verdict on first degree murder before it returned a verdict on second degree murder.  The words "before you even get to second degree murder" arguably could have been construed to refer to consideration of second degree murder during deliberations.  (See generally *People v. Perez* (1989) 212 Cal.App.3d 395, 399–400.)  But when a claim of misconduct is based on the prosecutor's comments before the jury, we consider the complained-of remarks as a whole and do not lightly infer that the jury drew the most, rather than the least, damaging meaning from them.  (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 894.)
>
> Assuming the prosecutor's argument can be read as [Petitioner] suggests, any misstatement was manifestly harmless.  Unlike in most other cases involving the "acquittal first" rule, here the alleged misstatement was not contained in an instruction or response given by the trial court, but was part of the prosecutor's argument.  (Cf. *People v. Kurtzman*, *supra*, 46 Cal.3d at pp. 327–328; *People v.*

25

*Olivas* (2016) 248 Cal.App.4th 758, 772.)  [Petitioner's] jury was properly instructed with CALCRIM No. 640, which unambiguously stated that the jury could consider the charges in whatever order it wished, rather than in a particular sequence.[10]  "[A]rguments of counsel 'generally carry less weight with a jury than do instructions from the court.  The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter . . . are viewed as definitive and binding statements of the law.'" (*People v. Mendoza*, *supra*, 42 Cal.4th at p. 703.)  "When argument runs counter to instructions given a jury, we will ordinarily conclude that the jury followed the latter and disregarded the former. . . ." (*People v. Osband* (1996) 13 Cal.4th 622, 717.)  There is no reasonable probability that jurors here not only misinterpreted the prosecutor's remarks, but also ignored the trial court's clear instructions.  (See *People v. Perez*, *supra*, 212 Cal.App.3d at pp. 399–400.)

> [10]   CALCRIM No. 640 provided in pertinent part: "You may consider these different kinds of homicide in whatever order you wish, but I can accept a verdict of guilty or not guilty of second degree murder as a lesser included offense only if all of you have found the defendant not guilty of first degree murder . . ."

(Lodg. E at 39-40.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable.  In evaluating a claim of prosecutorial misconduct, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647; *see also Babbitt v. Calderon*, 151

F.3d 1170, 1179-80 (9th Cir. 1998) (commenting that federal habeas courts "do not interpret ambiguous statements of a prosecutor in their most unconstitutional light").  It was not objectively unreasonable for the California Court of Appeal to infer that the prosecutor's comments did not have their most damaging meaning, because most of the comments could reasonably be interpreted as a correct statement to the jury about the order in returning a verdict, rather than the order in which to consider the charges.

Only one ambiguous comment, involving acquittal of first-degree murder "before you even get to second degree murder," arguably related to the order in which to consider the charges.  As to that comment, any misstatement was harmless.  The trial court instructed the jury that it could consider the charges in "whatever order" it wished, rather than in any particular sequence.  (CT 164; 4 RT 1248.)  It is reasonable to presume that the jury followed the trial court's instructions about the order to consider the charges, rather than the prosecutor's ambiguous statement in this regard.  *See Boyde*, 494 U.S. at 384-85; *Medina Casteneda*, 511 F.3d at 1250.  Accordingly, habeas relief is not warranted for this claim.

### c.      Mischaracterizing the Evidence of Petitioner's Drugs Sales and Firearms Use.

During his closing argument, the prosecutor stated the following about Petitioner's past conduct:

> Cocaine dealer.  Denied a lot of it, but I do a little bit, you know.  Well, what happens when somebody want to come take your stuff, take your money?  Is it amazing that somebody would sell cocaine would be armed?  I'm not talking about what his level of sales.  I don't care about that.  They only thing I'm telling you is that somebody like this knows firearms and knows if a gun in his pocket is loaded.

27

(4 RT 1266.)

Petitioner claimed that the prosecutor committed misconduct by referring to Petitioner as a "cocaine dealer" who "always" or "regularly" carried a firearm to protect his "stuff." (Dkt. No. 5-2 at 1; *see also* Lodg. A at 69.) The California Court of Appeal rejected this claim:

> We discern no error. Prosecutors have """wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]"" [Citation.]" (*People v. Sandoval* (2015) 62 Cal.4th 394, 439.) A prosecutor may state matters not in evidence that are common knowledge or drawn from common experience. (*People v. Mendoza* (2016) 62 Cal.4th 856, 908.) Such was the case here. "[I]t is common knowledge that perpetrators of narcotics offenses keep weapons available to guard their contraband." (*People v. Bradford* (1995) 38 Cal.App.4th 1733, 1739.) [Petitioner] admitted he sometimes sold or traded cocaine. Contrary to [Petitioner's] argument, the prosecutor did not state that [Petitioner] "always" or "regularly" carried a gun. Nor did the prosecutor suggest [Petitioner] was a large-scale cocaine dealer; he expressly avoided making any assertion about [Petitioner's] "level of sales."

(Lodg. E at 41.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. A prosecutor may draw reasonable inferences from the evidence admitted at trial. *See Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005); *United States v. Henderson*, 241 F.3d 638, 652 (9th Cir. 2000) ("Prosecutors have considerable leeway to strike hard blows based on the evidence and all reasonable inferences from the evidence.") (citations and internal quotation marks omitted). Here, the evidence admitted at trial demonstrated that

28

Petitioner had sold drugs (4 RT 983, 1014); had bought the gun used to shoot the victim a week earlier, from a drug dealer (4 RT 999); had admitted that he knew about firearms (4 RT 1028); and had known of two other guns in his house, one of which belonged to him (*id*.). The prosecutor's characterization of Petitioner as a "cocaine dealer" who was "armed" and knew about "firearms" was a reasonable inference from this evidence.

A prosecutor also may appeal to the jury's common knowledge, observations, or experience in evaluating the evidence at trial. *See Hard v. Burlington Northern R. Co.*, 870 F.2d 1454, 1462 (9th Cir. 1989) ("It is expected that jurors will bring their life experiences to bear on the facts of a case.") (citing *Head v. Hargrave*, 105 U.S. 45, 49 (1881)); *see also Beck v. Alabama*, 447 U.S. 625, 642 (1980) ("Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them."); *Williams v. Florida*, 399 U.S. 78, 100 (1970) ("[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen[.]"). Here, as the California Court of Appeal noted, it is a matter of common knowledge that drug dealers keep weapons to protect their contraband. By drawing attention to it, the prosecutor did not commit misconduct. *See United States v. Acuna*, 339 F. App'x 723, 725 (9th Cir. 2009) (holding that a prosecutor permissibly appealed to the "common sense" of the jurors by pointing out that drug smugglers generally do not involve outside individuals in drug trafficking operations); *see also United States v. Cruz-Valdez*, 773 F.2d 1541, 1546-47 (11th Cir. 1985) (collecting cases for the proposition that, as a matter of common sense or general knowledge, "jurors and courts know much more about commerce in controlled substances than they did a decade or more ago"). Accordingly, habeas relief for this claim is unwarranted.

\\\
\\\
\\\
\\\
\\

### d. Attacking Defense Counsel's Integrity.

During his closing argument, defense counsel argued that Petitioner was not guilty of murder but conceded that he was guilty of involuntary manslaughter. (4 RT 1278-79, 1297.) During his rebuttal argument, the prosecutor stated the following:

> [Defense counsel] did a fantastic job defending a guilty man. But he's stuck with the facts that he cannot change. I didn't think that he was going to come up here and ask for a straight acquittal because I think he would lose all credibility if he had asked you to do that.

> But what he's asking you to do is kind of like be Solomon like, you know what, like we get to hold someone responsible for this and you can walk out of here with your head held high because you know what, you didn't do nothing, right. You convicted him of something.

> Ladies and gentlemen, that would not be fair. It would not be right because what you'd be doing is saying, you know what, although we're not supposed to take punishment, probably going to get something. Right. Not going to go home tomorrow. That would not be what you said you would do. You said that you would weigh the evidence and you would convict him of the crime that was proven to you by the evidence.

(4 RT 1297-98.)

Petitioner contends that the prosecutor committed misconduct by attacking defense counsel's integrity by suggesting defense counsel did not believe in the case. (Dkt. No. 5-2 at 2; *see also* Lodg. A at 70-73.) The California Court of Appeal rejected this claim:

30

A prosecutor commits misconduct if he or she attacks defense counsel's integrity, casts aspersions on defense counsel, or claims that defense counsel does not believe in his client's innocence or theory of the case. (*People v. Williams*, *supra*, 1 Cal.5th at p. 1188 [it is error for a prosecutor to argue defense counsel knew his client was guilty but proceeded with a sham defense]; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1337; *People v. Edwards*, *supra*, 57 Cal.4th at p. 738.) "'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation] and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation]." (*People v. Edwards*, at p. 738.)

There is no likelihood jurors would have interpreted the argument as [Petitioner] suggests. [Petitioner's] reading of the prosecutor's words is strained. The prosecutor did not "engage in such forbidden tactics as accusing defense counsel of fabricating a defense or factually deceiving the jury." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1154, disapproved on another ground by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Stitely* (2005) 35 Cal.4th 514, 559–560.) Fairly read, the prosecutor stated only that the defense recognized the evidence was incompatible with a complete acquittal — which was, in fact, precisely what defense counsel argued. These statements did not impugn defense counsel's integrity or suggest he believed [Petitioner] was guilty of murder. Contrary to [Petitioner's] conclusory contention, nothing about the prosecutor's statements lightened the state's burden of proof.

The authorities [Petitioner] cites in support — *People v. Pitts* (1990) 223 Cal.App.3d 606 and *People v. Bell* (1989) 49 Cal.3d 502 — bear no resemblance to the instant matter. In *People v. Pitts* the prosecutor subtly implied defense counsel knowingly presented perjured testimony. (*People v. Pitts*, at p. 705.) In

*People v. Bell*, the prosecutor argued that although counsel averred the defendant did not commit the crime, counsel's attention to special circumstances issues suggested "'he might be worried that he did commit it,'" implying counsel believed his client was guilty. (*People v. Bell*, at p. 537.) The prosecutor's argument in this case cannot be stretched to imply that counsel suborned perjury or thought [Petitioner] was guilty of murder.

(Lodg. E at 42-44.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. The prosecutor's comments were a fair criticism of defense counsel's strategic concession that Petitioner was guilty of involuntary manslaughter rather than murder. Such comments did not impugn defense counsel's integrity, but rather were a permissible assessment of the strength of the defense's case. *See United States v. Ruiz*, 710 F.3d 1077, 1086 (9th Cir. 2013) (holding that a prosecutor's reference to the defense's case as "smoke and mirrors" was not misconduct because it was a comment on the strength of the defense's case, rather than an *ad hominem* attack on defense counsel); *United States v. Palomo*, 714 F. App'x 799, 800 (9th Cir. 2018) (finding no misconduct in characterizing a defense tactic as a "shell game" because "criticizing defense tactics is fair game during closing, and this type of argument is generally considered well within normal bounds of advocacy.") (citation and internal quotation marks omitted); *see also Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998) (finding no misconduct where prosecutor referred to the defense's closing argument as "trash," because a lawyer "is entitled to characterize an argument with an epithet as well as a rebuttal"). Accordingly, habeas relief is not warranted for this claim.

\\\
\\\
\\\
\\\

**e. Accusing Petitioner of Lying or Committing Perjury.**

During his closing argument, the prosecutor stated the following about premeditation and deliberation:

> How do we know that? Because [Petitioner] lied. And I'm going to tell you what all his lies are in a minute.
>
> He lied about having that gun in his pocket. You know why, because he had just beat [the victim] up. [The victim] went off to his room. Why did he have to leave the kitchen area? Why? Because he's carefully weighing the considerations before and against his choices, right. [¶] . . . [¶] . . . Okay. If he had that gun in his pocket why not just pull it out then[?]

(4 RT 1259.)

The prosecutor later stated the following about the videotape:

> Defense attorney tried to infer that these lacerations [to the victim's] head were not caused [by Petitioner's punches]. [Petitioner] lied, I never hit him in the face. Lined him up. Remember how he pulled up his sleeve and just made sure he had a good shot. What was he aiming for, his chest?

(4 RT 1259-60.)

The prosecutor later stated the following in response to defense counsel's closing statement about Petitioner's testimony:

[Defense counsel] also said that some of his client['s] testimony is ridiculous. I would submit to you 90 percent of it was. You know what the jury instruction says, if you think that someone purposely lied to you, you can consider not believing anything they said.

(4 RT 1303.)

The prosecutor later stated the following about Petitioner's testimony about the reason for his argument with the victim:

[Theodore testified] no, [the victim] don't smoke in the house. That's a lie that [Petitioner] told you. It wasn't about that. Rochandra never said that. She said it was about bills. Why is he lying? Why is Rochandra lying? [¶] . . . [¶] Guilty people try to save themselves. That's what they do. They deflect. They make excuses. And they lie. That's what [Petitioner] did up on the stand."

(4 RT 1303-04.)

Petitioner argues that the prosecutor committed misconduct in these instances by arguing that Petitioner had committed perjury or was a liar. (Dkt. No. 5-2 at 2; *see also* Lodg. A at 73-74.) The California Court of Appeal rejected this argument:

Citing *People v. Ellis* (1966) 65 Cal.2d 529, [Petitioner] argues the prosecutor committed misconduct "by arguing that [Petitioner] committed perjury, by lying when he testified." In *People v. Ellis*, the prosecutor repeatedly "reference[d] [defendant] and his alibi witnesses as perjurers." (*Id.* at p. 539.) The court explained that a prosecutor may point out inconsistencies in the evidence, but "tread[s] on dangerous ground" when he or she "resort[s] to epithets

34

to drive home the falsity of defense evidence. [Citation.] The term liar, for instance, implies more than offering untrue testimony; it implies a willful falsehood. [Citation.] The term perjurer has, as its only formal semantic distinction vis-à-vis liar, the additional element of the oath. [Citations.] A charge of perjury, however, produces more than moral opprobrium. Perjury is a felony, and the connotation conveyed to the jury is therefore apt to be far more derogatory than that conveyed by the term liar. Particularly when applied to the defendant, it is apt adversely and unnecessarily to affect the ability of the jury dispassionately to weigh the credibility of the accused and the issue of guilt or innocence. Unless the prosecutor is careful to state that his conclusion that perjury was committed is predicated solely on the evidence before the jury, the spectre of jury reliance on prosecutorial access to information outside the record is raised." (*Id*. at pp. 539–540.)

*Ellis* is inapt here, for the simple reason that the prosecutor in this case did not use the terms perjury or perjured. The prosecutor properly argued that the evidence showed [Petitioner] was lying, as demonstrated by the video and the testimony of other witnesses. "A prosecutor may vigorously challenge the validity of any defense, and can characterize the testimony of a witness, including the defendant, as untruthful . . ." (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1337; *People v. Friend* (2009) 47 Cal.4th 1, 32 [when a defendant's testimony contradicts the strong evidence of his guilt, it is not improper to call him a liar]; *People v. Williams*, *supra*, 1 Cal.5th at p. 1189.) The prosecutor's argument was a fair comment on the evidence. (See *People v. Winbush* (2017) 2 Cal.5th 402, 484; *People v. Peoples* (2016) 62 Cal.4th 718, 796.)

(Lodg. E at 45-46.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. As the Court of Appeal reasoned, the record did not show that the prosecutor had accused Petitioner of perjury based on evidence that was not before the jury. Rather, the prosecutor argued that, based on evidence the jury had heard, Petitioner's account of the shooting was a lie. A prosecutor is permitted to argue that a defendant is lying, so long as the argument is based upon permissible inferences from the record. *See United States v. Ruiz*, 710 F.3d 1077, 1083 (9th Cir. 2013) (collecting cases); *United States v. Moreland*, 622 F.3d 1147, 1161 (9th Cir. 2010) ("[T]he prosecution may refer to the defendant as a liar if it is commenting on the evidence and asking the jury to draw reasonable inferences.") (citation and internal quotation marks omitted); *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir.1993) ("[W]e have recognized that prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, including that one of the two sides is lying.") (citations omitted); *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) ("In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying.") (citing *United States v. Laurins*, 857 F.2d 529, 539 (9th Cir. 1988) (statement that defendant was a liar could be construed as a comment on the evidence)); *see also United States v. Rude*, 88 F.3d 1538, 1548 (9th Cir. 1996) (holding that the prosecutor's use of words such as "lie," "lies," or "lied" more than 90 times during closing argument was within the bounds of proper summation). The prosecutor's argument that Petitioner was lying was a permissible comment on the evidence because it relied on inconsistencies between Petitioner's account of the shooting and other evidence before the jury. Accordingly, habeas relief is not warranted for this claim.

\\\
\\\
\\\
\\\
\\\

**f.    Arguing Matters Outside the Record and Appealing to Sympathy.**

During his closing argument, defense counsel stated that it was not realistic for Petitioner to have turned himself into the police:

> And you know, in [the prosecutor's] world, all [Petitioner] would have to do is just walk into Century Station and say, you know what, I'm . . . here to surrender and everything would have been fine. Nothing to be afraid of at all.

> I think that that's not realistic. I think that police are seen differently for different folks and I think for maybe [the prosecutor], that would not have been an issue.

> But I can understand why perhaps [Petitioner] would not have wanted to just simply walk into Century Station and put his hands on the counter, as he said, and say hi, I'm . . . here to surrender.

(4 RT 1287-88.)

During his rebuttal argument, the prosecutor stated the following:

> [Defense counsel] says it's a tragedy. You know what, tragedies are when, you know, hurricane blows through my child's home country of Haiti. We adopted him about six years ago. And it's funny because [defense counsel] says, he says may [for the prosecutor], it would be different if he would turn himself in. I knew what he meant by that. He's saying that it's not easy for a black man.

Well, I'll tell you what. If my son who happens to be black ever is involved in something like this, ladies and gentlemen, the first thing I'm going to do is tell them to go turn yourself in and tell the truth, whatever it takes, right. Because the truth will come out. Whatever it is, we can deal with that. That's the right thing to do.

(4 RT 1304.)

Petitioner contends that this portion of the prosecutor's rebuttal argument was misconduct because it involved a matter outside the record (the prosecutor's adoption of a child) and portrayed the prosecutor as a "hero" who had rescued a child from "the perils of life in a poor, third-world country." (Dkt. No. 5-2 at 3; *see also* Lodg. A at 76.) The California Court of Appeal rejected this argument:

It is improper for a prosecutor to assume or state facts not in evidence. (*People v. Thomas* (2011) 51 Cal.4th 449, 494.) Nor may a prosecutor "'make arguments to the jury that give it the impression that "emotion may reign over reason," [or] present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." [Citation.]'" (*People v. Linton*, *supra*, 56 Cal.4th at p. 1210.) However, illustrations drawn from common experience, history or literature, as well as anecdotes and jokes, are commonly regarded as acceptable during argument. (*People v. Harrison* (2005) 35 Cal.4th 208, 248.)

. . . .

[W]e do not lightly infer that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. (*People v. Covarrubias*, supra, 1 Cal.5th at p. 894.) The prosecutor's remarks were but a brief and insignificant part of his argument, did not pertain to the most significant evidence

38

against [Petitioner], and did not reference any out-of-court evidence related to the crime, the parties, or the witnesses. In context, the prosecutor was simply illustrating his point that regardless of a defendant's race, turning oneself in was the right thing to do. This argument was not inflammatory and did not invite an emotional or irrational response. Fairly read, the comments did not suggest the prosecutor was a "hero" because he was an adoptive parent.

Significantly, the jury was instructed that it should not let bias, sympathy, or prejudice (including bias for or against attorneys) influence its decision; that it must decide the case based on the evidence alone; and that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence." We presume the jury followed these instructions, which dispelled any possible prejudice. (See *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 821, 859.)

(Lodg. E at 47-48.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. As noted, "a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647; *see also Babbitt*, 151 F.3d at 1179-80. Here, the prosecutor's remarks about Petitioner's failure to turn himself into police and his story about his adoption of his child from Haiti, when stripped from their most damaging interpretations, did not rise to the level of misconduct.

As the California Court of Appeal explained, the remarks were a brief and insignificant part of the prosecutor's closing argument, concerning Petitioner's conduct several days after

the shooting, which was not central to the murder charge and was not inflammatory. *See Donnelly*, 416 U.S. at 646-47 (finding no constitutionally reversible error in improper but isolated comments during closing arguments); *Hall v. Whitley*, 935 F.2d 164, 165-66 (9th Cir. 1991) (finding no due process violation from prosecutor's reference to the petitioner's heroin use because "the comments were isolated moments in a three day trial"); *United States v. McWilliams*, 730 F.2d 1218, 1222 (9th Cir. 1984) (*per curiam*) (holding that, if the misconduct complained of was "isolated and was not inflammatory," then reversal is not warranted). Moreover, the jury were given instructions as to how to assess the evidence and the attorneys' arguments. The jury was instructed not to let bias, sympathy, or prejudice influence its decisions (CT 135; 4 RT 1227); was instructed to decide the case based only on the evidence presented in the courtroom (CT 131; 2 RT 396); and was instructed that the attorneys' arguments were not evidence (CT 131; 2 RT 397). It is presumed the jury followed these instructions. *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions."); *see also Leavitt v. Arave*, 383 F.3d 809, 834 (9th Cir. 2004) ("[W]e note that the jury was instructed that argument of counsel is not evidence. That instruction tends to draw the sting from improper arguments."). For these reasons, habeas relief is not warranted for this claim.

### g. Relying on Biblical Doctrine.

During his closing argument, the prosecutor referred to the story of Cain and Abel from the Bible:

> You know, I do these cases involving family members quite a bit. And the hardest thing is to convince jurors that family members want to hurt each other. Because we think [to] ourselves that blood is thicker than water. We think to ourselves you know what, in times of trouble who is going to be there for me? My family.

40

That's who's there. That's who I can count on. And you know what, you can also count on that people do bad things to each other regardless of blood relations.

I don't mean to get all biblical, but the first recorded murder in the Bible is Cain and Abel. There's one thing that's interesting about that is, you know, when I went to training for this job they said develop a theme for your case. I thought it was kind of dumb.

I was like, look isn't it just about facts and evidence. But when I got this case, I couldn't help but that image came up. And the one line that sticks out is am I my brother's keeper. You know what, everybody gets tired of being their brother's keeper at some point. That's where [Petitioner] was at.

What did Cain do? He said, what? Did he say yeah, I did it. No, he didn't. It's human nature, folks. That's what people do. They don't take responsibility for it, right.

Now, like I said, I'm not trying to pull on your emotion strings. What I'm trying to tell you is [p]eople do bad things to each other.

It doesn't matter whether they're related or they're not. So when you go back in that jury room, just remember that it's about the actions, not you know what, brothers they don't do this to each other — they do.

(4 RT 1305-06.)

41

Petitioner argued that the prosecutor committed misconduct because the Biblical references were improper appeals to religious authority. (Dkt. No. 5-2 at 3; *see also* Lodg. A at 64-65.) The California Court of Appeal rejected this argument:

> Appeals to religious authority during argument are impermissible. A jury is charged with deciding questions of historical fact based on the evidence, and religious input has no role in this process. (*People v. Harrison*, *supra*, 35 Cal.4th at p. 247.) "But not every reference to the Bible is an appeal to religious authority. Not only is the Bible a religious text, but it is also generally regarded as a literary masterpiece; indeed, it is among the oldest and best-known literary works in our culture. . . . [The California Supreme Court] has repeatedly held that in closing argument attorneys may use 'illustrations drawn from common experience, history, or literature.' [Citations.]" (*Id*. at p. 248.) However, when "references to the Bible are involved, the line between literary allusion and religious appeal is often a fine one. A prosecutor who mentions the Bible in closing argument runs a grave risk that a reviewing court will find that the line has been crossed and will reverse the defendant's conviction. Because any use of biblical references in argument must be carefully scrutinized, cautious prosecutors will choose to avoid such references. *Nevertheless, so long as they do not appeal to religious authority, prosecutors may refer to the Bible in closing argument to illustrate a point*." (*Ibid*., italics added.)

> Here, a reasonable juror would not have understood the prosecutor's remarks as an appeal to religious authority. Instead, the prosecutor's clear point was that fratricide was known to exist from antiquity, and the fact [the victim] and [Petitioner] were brothers did not preclude a finding of murder. Likewise, the statement that Cain denied killing Abel was offered to show that, as a matter of common knowledge, it has been true since ancient times that persons guilty of

crimes sometimes deny committing them. The prosecutor did not state or imply that biblical doctrine required a murder conviction. To the contrary, the prosecutor stated the jury should remember "that it's about the actions." Because the prosecutor did not use the biblical allusion as an appeal to religious authority, there was no prosecutorial misconduct. (*People v. Harrison*, *supra*, 35 Cal.4th at p. 248.)

[Petitioner] also argues that the prosecutor offered unsworn testimony, and "portray[ed] himself as some sort of expert in family law matters" by arguing that it was human nature to deny guilt. But a prosecutor may argue facts not in evidence that are common knowledge. (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 908.) It is reasonable to argue, as a matter of common knowledge, that it is not unusual for persons to deny culpability in order to escape liability. (Cf. CALCRIM No. 105 [whether witness has a personal interest in how a case is decided is a factor going to witness credibility].) The jury was, of course, free to reject this argument, but the prosecutor did not become an unsworn witness by making it.

(Lodg. E at 49-51.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. The California Court of Appeal was not required to give the prosecutor's comments their most damaging meaning, *i.e.*, that biblical or religious doctrine required Petitioner's murder conviction. Rather, it was fair to interpret the prosecutor's reference to the Bible story of Cain and Abel as a dramatic illustration for the seriousness of the crime and for Petitioner's denial. This interpretation was supported by the prosecutor's argument as a whole, which reflects that he correctly told the jury "that it's about the actions." (4 RT 1306.) Given this context, the reference to the Bible story did not amount to prosecutorial misconduct.

*See United States v. Amlani*, 111 F.3d 705, 714-15 (9th Cir. 1997) (holding that a prosecutor's reference to the Seventh Commandment during closing argument was not an impermissible appeal to religious prejudice where it had a logical connection to the evidence) (citing *United States v. Levy-Cordero*, 67 F.3d 1002, 1008-09 (9th Cir. 1994) (not reversing even though the prosecutor recited a hymn about good and evil and then vouched for the "good" of the prosecution's witnesses and the "evil" of the defense)); *United States v. Woodard*, 697 F. App'x 915, 917 (9th Cir. 2017) (holding that a prosecutor's reference to a Biblical parable about a "wolf in sheep's clothing" was a permissible rhetorical flourish). Accordingly, habeas relief is not warranted for this claim.

Petitioner further argued that the prosecutor's comment that it is "human nature" to deny guilt because "that's what people do" was unconstitutional in further respects. Such a comment allegedly amounted to the prosecutor offering unsworn testimony and offering himself as a family law expert. (Dkt. No. 5-2 at 3; *see also* Lodg. A at 80.) The California Court of Appeal rejected this claim:

> [Petitioner] also argues that the prosecutor offered unsworn testimony, and "portray[ed] himself as some sort of expert in family law matters" by arguing that it was human nature to deny guilt. But a prosecutor may argue facts not in evidence that are common knowledge. (*People v. Mendoza*, *supra*, 62 Cal.4th at p. 908.) It is reasonable to argue, as a matter of common knowledge, that it is not unusual for persons to deny culpability in order to escape liability. (Cf. CALCRIM No. 105 [whether witness has a personal interest in how a case is decided is a factor going to witness credibility].) The jury was, of course, free to reject this argument, but the prosecutor did not become an unsworn witness by making it.

(Lodg. E at 49-51.)

44

The California Court of Appeal's rejection of this claim was not objectively unreasonable.   The prosecutor did not suggest that the jury consider facts not in evidence in order to assess the credibility of Petitioner's testimony that the shooting was an accident.   Rather, the prosecutor called on the jury to consider that, as a matter of common knowledge about human behavior, it is not unusual for a defendant to testify that he did not commit the charged crime.   When viewed in this light, the prosecutor's comment did not amount to misconduct.  *See United States v. Cortez*, 449 U.S. 411, 418 (1981) ("Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same[.]"); *see also United States v. Kornegay*, 410 F.3d 89, 97 n.6 (1st Cir. 2005) (rejecting prosecutorial misconduct claim where the prosecutor asked the jury to use "common sense" to determine whether a witness had lied, because there is "no authority for the proposition that a prosecutor cannot ask a jury to use common sense in evaluating a witness' possible bias.  Inherent in such a common sense evaluation is that each juror will place him or herself in the witness' position to judge the witness' motivations based on the juror's notion of typical human behavior"); *see also Hard*, 870 F.2d at 1462 ("It is expected that juror will bring their life experiences to bear on the facts of a case.").   Accordingly, habeas relief is not warranted for this claim.

### III.  Habeas Relief Is Not Warranted For Petitioner's Claim Relating To A Lesser-Included-Offense Instruction.

In Ground Three, Petitioner claims that the trial court violated his due process rights by failing to instruct the jury on voluntary manslaughter based on theory of heat of passion.  (Dkt. No. 5 at 6; Dkt. No. 5-2  at 16-21; *see also* Dkt. No. 23 at 7-8.)  Voluntary manslaughter based on heat of passion is a lesser included offense of murder.  *See People v. Cole*, 33 Cal. 4th 1158, 1215 (2004).

\\\

\\\

## A.    *Teague* Doctrine.

Respondent contends that this claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989). (Dkt. No. 17 at 45-48.)  Where the state properly raises a *Teague* argument, the Court generally must address it before reaching the merits of a petitioner's claim.  *See Horn v. Banks*, 536 U.S. 266, 267 (2002) (*per curiam*); *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994); *Butler v. Curry*, 528 F.3d 624, 633 (9th Cir. 2008); *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir. 2007).  Here, Respondent contends that granting relief on Ground Three would require the announcement of a new rule of constitutional law that a non-capital defendant is entitled to an instruction on a lesser-included offense. (Dkt. No. 17 at 46.)

Under the *Teague* doctrine, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague*, 489 U.S. at 310.  "In general . . . a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301.  Put another way, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *See id*.  A new rule of constitutional law cannot be applied retroactively on federal collateral review to upset a state conviction or sentence unless the new rule forbids criminal punishment of primary, individual conduct or is a "watershed" rule of criminal procedure. *See Teague*, 489 U.S. at 311-13; *see also Caspari v. Bohlen*, 510 U.S. 383, 396 (1994).  To determine whether a habeas petitioner is entitled to the application of a particular rule, the habeas court performs a three-step analysis:  (1) the date on which the defendant's conviction became final is determined; (2) the habeas court considers whether the rule is new; and (3) if the rule is new, the court determines whether the rule nonetheless falls within one of the two narrow exceptions. *See O'Dell v. Netherland*, 521 U.S. 151, 156-57 (1997).

At the time that Petitioner's conviction became final in 2019, the United States Supreme Court had never held that a defendant has a constitutional right to a jury instruction on a lesser offense in a non-capital case. *Cf. Beck v. Alabama*, 447 U.S. 625 (1980) (holding in a capital case that the death sentence was not constitutionally imposed where the jury was not permitted to consider a lesser included non-capital offense when the evidence supported such a verdict). Moreover, the Ninth Circuit explicitly has held that "the failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984); *see also Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (noting that the Ninth Circuit declined to extend *Beck* to non-capital cases); *Windham*, 163 F.3d at 1106 ("Under the law of this circuit, the failure of a state court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."). The Ninth Circuit has also held that to extend habeas relief under *Beck* to non-capital cases would create a new rule in violation of *Teague*. *See Turner v. Marshall*, 63 F.3d 807, 819 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999). Thus, by the time that Petitioner's conviction became final, the trial court's failure to instruct the jury on lesser-included offenses implicated a new rule under the *Teague* doctrine.

Petitioner has failed to show that either of *Teague*'s two exceptions applies here. The first exception — the decriminalization of primary, individual conduct — is inapplicable because the proposed new rule would not decriminalize any class of conduct. The second exception — for a "watershed" rule of criminal procedure — is inapplicable because the proposed rule does not implicate the fundamental fairness and accuracy of a criminal trial. *See Whorton*, 549 U.S. at 417. Thus, Petitioner's claim of instructional error in Ground Five appears to be barred by the *Teague* doctrine.

\\\

\\\

\\\

**B.      Additional Reasons Relief Is Unavailable.**

Habeas relief is unwarranted for this claim for additional reasons.  First, as noted, this claim is not cognizable on federal habeas review.  See *Bashor*, 730 F.2d at 1240; *Windham*, 163 F.3d at 1106.  Second, this claim is not governed by clearly established federal law.  In the absence of a Supreme Court holding that a defendant has a constitutional right to a *sua sponte* jury instruction on a lesser-included offense in a non-capital case, it cannot be said that the California Court of Appeal's rejection of this claim was contrary to or involved an unreasonable application of clearly established federal law.  *See Bortis v. Swarthout*, 672 F. App'x 754, 754 (9th Cir. 2017) ("There is no Supreme Court precedent establishing that a state trial court is required to instruct on lesser included offenses in noncapital offenses.") (citing *United States v. Rivera-Alonzo*, 584 F.3d 829, 833 n.3 (9th Cir. 2009) ("In the context of a habeas corpus review of a state court conviction, we have stated that there is no clearly established federal constitutional right to lesser included instructions in non-capital cases.")); *Vived v. Marshal*, 242 F. App'x 448, 449 (9th Cir. 2007) ("Because there is no 'clearly established' Supreme Court law that requires giving a lesser included offense instruction in a non-capital case, we cannot grant habeas relief."); *Huynh v. Hernandez*, 2007 WL 186307, at *1 (9th Cir. 2007) ("[T]here is no 'clearly established' Supreme Court law that requires giving a lesser-included offense instruction on involuntary manslaughter in a non-capital case."); *see also McMullan v. Booker*, 761 F.3d 662, 666 (6th Cir. 2014) ("This claim fails because [petitioner] cannot point to any 'clearly established [f]ederal law' requiring a trial court to instruct the jury on a lesser included offense in a non-capital case.") (alteration in original); *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004) ("The Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases[.]").

In sum, Petitioner's claim that he was entitled to an instruction on the lesser included offense of voluntary  manslaughter is precluded by *Teague*, is not cognizable, and does not

implicate clearly established federal law. Accordingly, habeas relief is unwarranted for this claim.

**IV.** **Habeas Relief Is Not Warranted For Petitioner's Claims of Ineffective Assistance Of Counsel.**

In Ground Four, Petitioner claims that his counsel was ineffective for failing to object to the admission of Dr. Levicky's autopsy report as a violation of the Confrontation Clause and failing to object to the prosecutor's misconduct during cross-examination and closing argument. (Dkt. No. 5 at 6; Dkt. No. 5-1 at 10, 14-18; Dkt. No. 5-2 at 3-5; *see also* Dkt. No. 23 at 11-13.)

**A.** **Legal Standard.**

To succeed on his ineffective assistance of counsel claims, Petitioner must demonstrate that counsel's performance was both deficient and prejudicial to the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because both prongs of the *Strickland* test must be satisfied to establish a constitutional violation, a petitioner's failure to satisfy either prong requires the denial of the ineffectiveness claim. *See Strickland*, 466 U.S. at 697 (no need to address deficiency of performance if prejudice is examined first and found lacking); *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("[f]ailure to satisfy either prong of the *Strickland* test obviates the need to consider the other").

"To establish deficient performance, a person challenging a conviction must show that 'counsel's representation fell below an objective standard of reasonableness.'" *Richter*, 562 U.S. at 104 (citation omitted). However, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 690; *see also Pinholster*, 563 U.S. at 196. "The question is whether an attorney's

representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105. Notably, the failure to take a futile action or make a meritless argument can never constitute deficient performance. *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996); *see also Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994) (counsel is not obligated to raise frivolous motions, and failure to do so cannot constitute ineffective assistance of counsel); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").

To establish prejudice, a habeas petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. The court must consider the totality of the evidence before the jury in determining whether a petitioner satisfied this standard. *Strickland*, 466 U.S. at 695.

## B. Analysis.

### 1. Failure to Object to the Admission of the Autopsy Report.

As noted above, defense counsel intended to argue that the shooting was accidental, based on Dr. Levicky's autopsy finding that the bullet hit the victim at an upwards 70 degree angle. (3 RT 603-04.) However, on the first day of testimony, the parties learned that Dr. Levicky would not testify because he had retired, with plans to leave the country. (3 RT 604.) Defense counsel moved for a mistrial based on Dr. Levicky's unavailability, explaining that it is "now late breaking evidence that is at odds with evidence that I've been provided throughout

the entire case." (*Id.*) However, defense counsel's mistrial motion made no mention of *Crawford* or the Confrontation Clause. (*Id.*)

Petitioner contends that defense counsel's failure to raise a Confrontation Clause objection to the autopsy report was ineffective assistance of counsel. (Dkt. No. 5-2 at 15-18; *see also* Lodg. A at 52-54.) The California Court of Appeal rejected this claim:

> Here, the record reveals an obvious tactical purpose for counsel's failure to object to the autopsy evidence: counsel reasonably believed that the gunshot angle evidence supported the key defense theory that the shooting was an accident. [Petitioner] argues that the "importance of the angle of the entry of the bullet to the defense cannot be overstated — this evidence was the defense's entire case." [Petitioner] fails to acknowledge that if defense counsel had successfully challenged the autopsy evidence on confrontation grounds, the angle of entry evidence would have been *excluded*. Instead, the ruling counsel obtained was highly favorable for the defense: Dr. Levicky's undisputed observation about the angle of entry was elicited through Dr. Kennedy, and the prosecution had no opportunity to attack or attempt to qualify that evidence through cross-examination. Additionally, the defense relied on several other aspects of the autopsy evidence in support of its theory — evidence that would have been unavailable had counsel successfully moved to exclude it. [Petitioner] has therefore failed to establish ineffective assistance.

(Lodg. E at 17.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. Assuming without deciding that Dr. Levicky's report was objectionable on Confrontation Clause grounds, defense counsel had a legitimate tactical purpose for refraining

from objecting on those grounds. Dr. Levicky's report finding about the 70 degree gunshot angle was a critical piece of evidence supporting the defense's theory that the shooting was accidental. Because defense counsel had a sound strategic reason to have that finding admitted, his failure to object to Dr. Levicky's report was not deficient performance. *See Delgadillo v. Woodford*, 527 F.3d 919, 929 (9th Cir. 2008) (holding that counsel was not ineffective for failing to object to arguably inadmissible evidence where there could have been a reasonable trial strategy not to object); *Morris v. State of Cal.*, 966 F.2d 448, 456 (9th Cir. 1991) (same).

Moreover, there was no reasonable probability that, but for counsel's failure to object to the admission of the autopsy report on Confrontation Clause grounds, the result of the proceeding would have been different. The admission of Dr. Levicky's report was not damaging to Petitioner's defense but rather was highly favorable for the reasons the California Court of Appeal noted: Dr. Kennedy was permitted to testify about Dr. Levicky's findings (3 RT 628-30); the prosecution had no opportunity to challenge Dr. Levicky's findings; and the defense highlighted Dr. Levicky's findings, particularly about the entry angle of the bullet, to argue that the shooting was accidental (4 RT 1283-85). Accordingly, counsel's failure to object to Dr. Levicky's report on Confrontation Clause grounds did not result in prejudice.

Petitioner contends that defense counsel's failure to object to the autopsy report resulted in prejudice because an objection would have led to a subpoena for Dr. Levicky to testify at trial, either in person or through video. (Dkt. No. 5-2 at 17-18; Dkt. No. 23 at 12.) This contention fails to demonstrate prejudice because it depends on speculation that Dr. Levicky would have been willing to testify or would have been able to testify about any new findings separate from the findings already stated in his report. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (no prejudice under *Strickland* where that petitioner offered no evidence that an expert would have testified on his behalf at trial); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (same where the petitioner speculated about what the expert's testimony

would have been).  Moreover, Petitioner's contention that Dr. Levicky should have been called to testify ignores the Court of Appeal's finding that Petitioner strategically benefited from Dr. Levicky's absence because of the prosecutor's inability to cross-examine him (Lodg. E at 17), a benefit that would have disappeared had Dr. Levicky testified.  In sum, Petitioner has not demonstrated prejudice from defense counsel's failure to challenge the admissibility of Dr. Levicky's report on Confrontation Clause grounds.  Thus, habeas relief for this claim is unwarranted.

### 2.  Failure to Object to the Prosecutor's Cross-Examination.

As noted above, the prosecutor cross-examined Petitioner about whether he had been arrested in July 2015 for selling cocaine, a matter that was unsupported and irrelevant.  (4 RT 1008-11.)  Defense counsel did not object to the prosecutor's questions in front of  the jury but instead requested a sidebar, during which the trial court told defense counsel that an objection would have been sustained had defense counsel made one.  (4 RT 1010-11.)

The California Court of Appeal, after analyzing Petitioner's claims of prosecutorial misconduct "through the lens of ineffective assistance," necessarily rejected Petitioner's claim by finding that the underlying claim against the prosecutor's cross-examination did not amount to prejudicial misconduct.  (Lodg. E. at 32-35.)  It was not objectively unreasonable for the California Court of Appeal to conclude that defense counsel's failure to object to the cross-examination did not constitute ineffective assistance of counsel.  Specifically, defense counsel's failure to object to the prosecutor's questions about an arrest did not prejudice Petitioner because the jury had repeatedly heard evidence of Petitioner's drug selling activities outside the context of an arrest: the jury had heard Petitioner testify repeatedly that he occasionally sold drugs (4 RT 983, 992), including cocaine (4 RT 1014), and that he sold "crumbs of cocaine" to the victim (4 RT 1027).  The prosecutor's inquiry about an arrest was brief in comparison.  It therefore was not reasonably likely that the result of the trial would

have been different had defense counsel objected to the prosecutor's questions about an arrest for cocaine sales. *See Rupe*, 93 F.3d at 1444-45 (holding that defense counsel's failure to object to a prosecutor's inadmissible gun evidence was not prejudicial where the jury's exposure to the gun evidence was cursory). Accordingly, habeas relief for this claim is unwarranted.

### 3. Failure to Object to the Prosecutor's Closing Argument.

"Because many lawyers refrain from objecting during opening statement and closing argument, absent egregious misstatements, the failure to object during closing argument and opening statement is within the 'wide range' of permissible professional legal conduct." *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993) (quoting *Strickland*, 466 U.S. at 689). "From a strategic perspective, for example, many trial lawyers refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991).

As discussed above, Petitioner raised seven claims of prosecutorial misconduct during closing argument. Petitioner claims that his defense counsel was ineffective for failing to object to any of these statements. (Dkt. No. 5-2 at 4-5; *see also* Lodg. A at 80-83.) The California Court of Appeal rejected this claim:

> As we have explained, the challenged statements and questions either did not constitute misconduct or were harmless. Contrary to [Petitioner's] argument, the prosecutor did not engage in a "pervasive" pattern of misconduct. Accordingly, [Petitioner's] ineffective assistance claim fails because he has not shown any prejudicial prosecutorial misconduct.

(Lodg. E at 51.)

The California Court of Appeal's rejection of this claim was not objectively unreasonable. Four of the seven underlying instances of alleged prosecutorial misconduct during closing argument were not misconduct. Rather, the four remarks involved the prosecutor drawing permissible inferences from the evidence or responding fairly to defense counsel's arguments. Specifically, it was not misconduct when the prosecutor: argued that Petitioner was a cocaine dealer who was armed with a gun, argued that the evidence showed Petitioner was lying, criticized defense counsel's theory that Petitioner was guilty only of involuntary manslaughter, or referenced the Bible story of Cain and Abel to illustrate Petitioner's denial of responsibility. (Lodg. E at 40-46, 49-51.) Because the prosecutor did not commit misconduct with these four remarks, defense counsel could not have been ineffective for failing to object to them. *See Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015) (whether defense counsel performs deficiently by failing to object to a prosecutor's remarks depends on whether the remarks constituted objectionable misconduct); *see also Ayala v. Chappell*, 829 F.3d 1081, 1115 (9th Cir. 2016) ("Counsel was not constitutionally ineffective for failing to object to the prosecutorial statements because those statements were based on reasonable inferences from the record.") (citation and internal alterations omitted); *Molina*, 934 F.2d at 1447-48 (same).

The remaining three underlying instances of alleged prosecutorial misconduct involved comments that were more questionable but, given the context in which they were made, did not rise to the level of a due process violation. The prosecutor's three remarks involved the law regarding murder, the proper sequence of the jury's deliberations, and Petitioner's failure to turn himself into the police (which the prosecutor illustrated with a story about adopting a child from Haiti). As the California Court of Appeal found, these three remarks were ambiguous but, even after given the most damaging interpretation, they did not infect the trial with unfairness given the fuller context of the trial court's instructions on the law and the

parties' closing arguments on the whole.  (Lodg. E at 36-40, 46-48.)  Because these remarks did not involve "egregious misstatements," counsel's failure to object to them fell within the wide range of permissible professional legal conduct.  *See Necoechea*, 986 F.2d at 1281.  Even the remark that arguably was the most objectionable, involving Petitioner's failure to turn himself into the police and the prosecutor's adoption of a child, was brief and tangential to the murder charge.  (Lodg. E. at 48.)  Accordingly, defense counsel's failure to object to that remark did not result in prejudice.  *See Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (no prejudice from defense counsel's failure to object to the prosecutor's remarks denigrating the defense team where the remarks were brief).  Accordingly, habeas relief for this claim is unwarranted.

## ORDER

For all of the foregoing reasons, IT IS ORDERED that (1) the First Amended Petition is denied; and (2) Judgment shall be entered dismissing this action with prejudice.

DATED: March 20, 2020

KAREN L. STEVENSON
UNITED STATES MAGISTRATE JUDGE